IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2016

## STATE OF TENNESSEE v. BRANDON TALIAFERRO

**Appeal from the Criminal Court for Shelby County**
**No. 13-02659          James M. Lammey, Jr., Judge**

───────────────

**No. W2015-01840-CCA-R3-CD  -  Filed January 20, 2017**

───────────────

The Defendant, Brandon Taliaferro, was convicted of first degree murder in the attempt to perpetrate a robbery and attempted especially aggravated robbery. See Tenn. Code Ann. §§ 39-12-101; -13-202(a)(2); -13-403(a). In this appeal as of right, the Defendant contends (1) that the trial court erred by allowing the State to enter into evidence the entire tape-recorded conversation between the Defendant and a State's witness, the mother of his child, and (2) that the evidence was insufficient to sustain his convictions, arguing that there was no proof that he intended to rob the victim or that he was criminally responsible for the actions of the person(s) who killed the victim. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Laurie Winstead Hall (at trial and on appeal); and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Brandon Taliaferro.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Glen Baity and Bryce Phillips, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

-1-

This case arose following the August 7, 2012 shooting death of the victim, Jernario Taylor. Thereafter, the Shelby County Grand Jury charged the Defendant with one count of first degree murder in the attempt to perpetrate a robbery and one count of attempted especially aggravated robbery. A trial was held in the Criminal Court for Shelby County in July 2015.

Mallorie Brown testified that on August 7, 2012, she lived at Sunridge Apartments with the victim, who was the father of her two children. Tarkeisha Jones also lived with Ms. Brown and the victim at this apartment. Ms. Brown explained that the apartment was a two-story townhouse, with a front door and a back door. On the evening of August 7, 2012, Ms. Brown was in the upstairs portion of the apartment giving her infant daughter a bath. Afterward, she said that she went downstairs to the kitchen to wash dishes. During this time, the victim and Ms. Jones were seated on a couch in the living room on the first floor watching television. Shortly after Ms. Brown went downstairs to the kitchen, she heard a single shot. Upon hearing the shot, she moved from the kitchen into a hallway and saw two men inside the home, whom she later identified from a photograph array as the Defendant and his co-defendant, Daniel Nesbitt. She also observed Ms. Jones run out the back door. She said Mr. Nesbitt "jacked [her] up and said, 'B---h, where the money at?'" She explained that Mr. Nesbitt had grabbed her by the shirt and that she repsonded, "There ain't no money [sic]." While this was happening, she testified that she saw the victim lying on the living room floor and that the Defendant was present. She was able to escape the intruders, who were both armed, and ran out the back door. She ran around the apartment building, knocked on a neighbor's door, and called the police from her neighbor's home. On cross-examination, Ms. Brown admitted that she had previously obtained convictions for identity theft and forgery. When asked if hearing a shot was "what made [her] come downstairs," she replied, "Yes." She did not mention being in the kitchen prior to hearing the shot.

Tarkeisha Jones testified that the victim was her friend. When asked to describe what happened on August 7, 2012 around 2:00 or 3:00 a.m., she said that she and the victim were sitting on the couch in the living room. The Defendant, whom she had never met, knocked on the door and bought some marijuana. She explained that the victim sold marijuana out of his apartment, and she said from their conversation it appeared as if this was the Defendant's second time coming in the home that night. Ms. Jones said that the Defendant and the victim conducted a drug exchange, and then the Defendant picked up a candle jar and attempted to light a cigarette on the burning candle. Ms. Jones informed the Defendant that he was not allowed to smoke inside the home, and the victim gave the Defendant a lighter from his pocket. The Defendant took the lighter and went outside. Ms. Jones told the victim to retrieve the lighter from the Defendant. She stated that when the victim "stuck his head out, he kind of leaned back in and flinched[,]" and she heard one loud shot, then "the guy who shot [the victim] came in." She testified that the man

who shot the victim was not the Defendant. She further explained that when the victim flinched from the gunshot, he tried to push the door closed. She did not see the shooting. After hearing the shot, she ran out the back door of the apartment and hid behind a tree. From her hiding spot, she observed the shooter standing over the victim, and or, going through his pockets. She went to a neighbor's home and called the police.

Ms. Jones testified that there was a third person present during the shooting. The third person never went inside the aparment, but he was "standing up against the wall with a gun pointing in the front door." The gun the third man was holding "looked like [an] AK[-]47[,]" and the gun the shooter had was "a small black gun." She acknowledged on cross-examination that Mr. Nesbitt, the man with the handgun, was "five foot eight to five foot nine[,]" "with brown skin, medium complexion[,]" and he was wearing "a white T-shirt" and "red shorts." She did not see the Defendant holding a weapon and agreed that he had "a blue shirt, long dreads, and a ponytail, dark skin . . . a goatee . . . [and] blue shorts[.]" Ms. Jones also explained that Ms. Brown was in the apartment when the shooting occurred. She testified that Ms. Brown had been upstairs bathing her baby, and then she had gone downstairs into the kitchen. Ms. Jones heard a man "yelling at [Ms. Brown] . . . telling her to give him the money. And she was just screaming saying that she didn't have any money."

Ms. Jones acknowledged that when she gave her statement to police, she told the officers her name was Darneisha Theus. She used another name "[b]ecause [she] had a warrant for violation of probation, and [she] just didn't want to [go] to jail while this was going on." She was afraid if she had used her real name, the police would have arrested her. In a photographic lineup, Ms. Jones identified the Defendant.

At trial, Ms. Jones identified a photograph of the candle that the Defendant had picked up to light his cigarette. Additionally, the Defendant and the State agreed to two stipulations. First, they agreed that "the latent fingerprint found on the glass candle holder located at 4945 Clinchstone Circle on August 8th, 2012, by Memphis Police Department crime scene Officer Parish, corresponds to Shelby County Records and Identification No. 365971. This records and identification number belongs to that of the [D]efendant[.]" Second, they stipulated that "the identification uncovered by the Memphis Police Department at the Sunridge Apartments is a valid identification issued to [the Defendant] by the Tennessee Department of Safety."

J.D.[1] testified that he lived with his mother at Sunridge Apartments and was twelve years old at the time of the shooting. On August 7, 2012, J.D. was outside at the

---

[1] It is the policy of this court to protect the identity of minor victims and witnesses. Therefore, we will use initials for each minor involved in this case.

apartment complex, riding his bike, around 10:00 p.m. While riding his bike, J.D. saw a white car "that kept driving around the apartment." He stated that the only person he saw in the car was the driver. J.D.'s mother called him and told him to go inside, and after he spoke to her, he saw the white car again as "it flew past" and that it came from up the hill. He "saw two guys running from up the hill, and they jumped in the white car." He said after this, there were a total of three people in the white car. The white car stopped and picked up another person. J.D. described this person as having "dreads."

Detricia Peeples testified that the Defendant was the father of her son, who was seven years old at the time of the trial. She had known the Defendant for approximately ten years, and they were not dating in August 2012. Ms. Peeples drove a white Pontiac, and on August 7, 2012, she allowed the Defendant to borrow her car. The Defedant told her that he was going to use the car to go see his cousin. At that time, the Defendant was wearing "a blue T-shirt, some blue shorts, and some white Air Force 1s[,]" and his hair was "twisted down[.]" Early in the morning on August 8, 2012, the Defendant, accompanied by Mr. Nesbitt, returned the vehicle to Ms. Peeples. Later that day, the Defendant called Ms. Peeples and told her to turn on the news. She said the news story the Defendant told her to look at was about a home invasion, and the white car described in the news story was very similar to her own car. Also, the description of one of the suspects matched the physical appearance of the Defendant. She said the description was similar to the Defendant's "height" and "his weight."

Ms. Peeples also explained that she was able to make an audio recording of a telephone conversation she had with the Defendant a few days after she saw the news story regarding the home invasion. After she identified the Defendant's voice, the recording was played in the presence of the jury. Ms. Peeples explained that the Defendant called her and admitted that he and Mr. Nesbitt were responsible for robbing and killing the victim. In the first forty-three-seconds of the recording, the Defendant said, "It was me and [Mr. Nesbitt] . . . [Mr. Nesbitt] did it, but I assisted him."

The following three minutes of the recording were also played before the jury. The Defendant told Ms. Peeples, "You're just as involved [as] I am . . . I need you to understand that." Ms. Peeples denied being involved and said, "I don't have nothing to do with none of that." The Defendant said, "You think this is a joke? I'm not joking." When Ms. Peeples responded, the Defendant said, "Shut up, b---h . . . you gonna turn." When asked at trial what she thought the Defendant meant by this, she stated, "That he felt like I was gonna go to the authorities and snitch on him or something." On the recording, the Defendant told her, "I know what you know . . . . I told you what you know . . . I can't be fooled by what is going on." He informed Ms. Peeples, "A deal don't mean s--t. You don't know nothing." The Defendant further threatened the victim and said, "You don't f—k with me . . . because I'll put my hands on you . . . . I'm not going

to play with you." He told her, "You are responsible for this s--t, just as much as I am . . . . You're gonna ride on this s--t." He said, "You ain't even got to do much. Just tell [the police] you don't f--k with me like that." The Defendant again said, "You don't f--k with me." Near the end of the conversation, the Defendant informed Ms. Peeples that he would not be speaking with her for a few days and told her that he had to take care of business. Ms. Peeples testified that when she loaned the Defendant her car, she had no idea that he intended to rob the victim. Ms. Peeples asserted that she felt threatened by this conversation and that she was "worried about [her] own safety[.]"

The Defendant testified in his own defense about the evening of August 7, 2012. He explained that he had borrowed a car from Ms. Peeples to travel to Dyersburg with his cousin to sell marijuana to "a couple guys that he knew[.]" He testified that on his way to Dyersburg, he "ended up running into [Mr.] Nesbitt" in Frayser. Mr. Nesbitt and "a guy with him that he called his cousin" joined the Defendant. The Defendant testified that he sold all of his marijuana in Memphis and decided to go to the victim's house around 10:00 p.m. to purchase some for himself "to smoke for the night." He explained that he knew the victim and had purchased drugs from him in the past. He said that he did not see either Mr. Nesbitt or Mr. Nesbitt's companion with a weapon, and they never discussed robbing the victim. However, he explained that Mr. Nesbitt's companion was carrying a black backpack when he got in the car.

When they arrived at the victim's home, the Defendant went inside to purchase "something to go smoke" while the others remained in the car. Once inside, he purchased a "blunt, which [was] a gram" of marijuana. After purchasing the drugs and having a brief conversation, the Defendant left the apartment and returned to his car. In his car, he weighed the blunt on a small scale and realized it weighed "less than a gram." He went back to the apartment, knocked on the door, and went inside and told the victim that he had given him less than one gram of marijuana. The victim apologized and "opened up another . . . bag of weed . . . and fixed the blunt." He said this was his second trip inside the apartment, and he remained there for a few minutes talking with the Defendant and Ms. Jones, who was sitting on the couch in the living room. The Defendant also admitted that both he and the victim were drug dealers; however, he explained that the victim's death would not improve his own business because "it's not guaranteed that [the Defendant] even know [sic] half of the people or two percent of the people that [the victim] know [sic] . . . or served[.]"

After the victim fixed the blunt, the Defendant went back outside and returned to his car. He inspected the marijuana and realized "it was some actual good mari[j]uana[,]" so he decided to return a third time to the victim's apartment to purchase more drugs. He said that while he was inspecting the marijuana in his car, Mr. Nesbitt and his companion were having a discussion, but he was not paying attention to what they said. He

explained, "[I]t's nothing that was significant.  They were just laughing and joking – you know, having a cordial conversation."  At that time, he did not see either of them with a gun.

When he went back inside, he asked the victim to sell him two grams of marijuana.  While the victim was fixing the marijuana, the Defendant sat on the couch and started watching a movie playing on the television.  He claimed that he "was laughing and joking with [the victim] about certain scenes of the movie."  At some point, he picked up a candle to light a cigarette, but Ms. Jones informed him that he was not allowed to smoke inside the home.  He asked the victim for a lighter and went outside to smoke.  The victim opened the door of the aparment and "stuck his head out [of] the door, and as [the Defendant] was walking out, [Mr.] Nesbitt [came] around the corner."  The Defendant testified that he did not see Mr. Nesbitt carrying a weapon, and he told him, "I'm ready, come on.  Let's go."  However, Mr. Nesbitt walked past the Defendant.  He explained that the victim and Mr. Nesbitt went into the apartment while he remained outside "playing with" the marijuana.  He said he did not know what was going on because he was outside, but he did hear "cursing – like an argument."  At that point, the Defendant turned toward the house and claimed that he "felt like [Mr. Nesbitt] just lost it and went in there and wanted to argue and curse at a person."  He explained that he looked through the doorway of the apartment and saw the victim and Mr. Nesbitt wrestling.  He said, "[The victim] swung at [Mr.] Nesbitt, and it ended up [Mr.] Nesbitt reached in his back pocket, and that's when I seen him pull up a handgun."  He further explained that "when [Mr. Nesbitt] put the gun up, [the victim] grabbed his arm, and they [were] wrestling over the gun, and [he could not] tell . . . exactly how long it took, but it ended up [the victim] slammed [Mr. Nesbitt] to the . . . doorway, and the gun went off."  The Defendant explained that he was in shock after the gun went off because he was not expecting anything like that to happen.

The Defendant ran away from the apartment toward his car, but his car was no longer there.  He said that he was trying to get away from the situation because he did not want to be anywhere near Mr. Nesbitt.  He stated that he was wearing a blue baseball T-shirt and gym shorts.  He claimed that as he was running up the hill away from the apartments, he turned and saw Mr. Nesbitt driving Ms. Peeples' car up the hill, and he got in the car because "[Mr. Nesbitt] pulled up on the side of me, and he told me to get in.  He had a gun.  He just killed somebody.  I was tired.  I didn't have nowhere to run."  He explained that he was afraid Mr. Nesbitt might hurt him if he did not get in the car, and he needed to return the car to Ms. Peeples.

The Defendant said he returned the car to Ms. Peeples the next morning, August 8, 2012, at 5:00 a.m.  He said he was alone at the time he brought the car back to Ms. Peeples' home.  He admitted that he did not call the police regarding the shooting, and he

did not speak with police officers about the incident until December 2012. When asked why he waited four months, he responded, "I pretty much was just scared that if I went to the police or – I was scared that they was gonna – they was gonna lock me up for it basically."

Regarding the recorded phone conversation between himself and Ms. Peeples, the Defendant admitted that it was his voice on the recording. He said that he had called Ms. Peeples, but he claimed that he was drunk and high when he spoke with her. The Defendant acknowledged that the language in the recording was "both stupid and disrespectful" and said that at the time he made the call, he was "still in shock, just scared." The Defendant said he did not admit to assisting Mr. Nesbitt in the killing and claimed he had slurred speech due to his drunkenness and said, "[Mr. Nesbitt] done it, but I seeneded [sic] it." He said that he wanted to protect Ms. Peeples and that he had her best interests in mind. However, he was communicating in an inappropriate manner because he "was over intoxicated – too far into drinking."

At the conclusion of the trial, the jury convicted the Defendant as charged, and the Defendant was sentenced to serve eight years for attempted especially aggravated robbery concurrently with his sentence of life imprisonment for felony murder. The Defendant filed a timely notice of appeal. The case is now before us for our review.

## ANALYSIS

### I. Admissibility of Audio Recording

On appeal, the Defendant contends that after the forty-three-second mark, the remaining three minutes of the recording were irrelevant and unduly prejudicial. He argues that the remainder of the recording contained no admissions or threats to Ms. Peeples; thus, it was irrelevant. The Defendant argues that the recording was unfairly prejudicial because he used profanity throughout the recording and referenced a previous domestic dispute. He argues that the State introduced this portion of the recording to create a negative impression of him with the jury. The State responds that the entire four-minute conversation was relevant and not unduly prejudicial because the Defendant made threats to Ms. Peeples regarding her telling the police what she knew about his involvement in the victim's murder and that the trial court did not abuse its discretion in admitting the tape-recorded conversation.

Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be

excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[.]" Tenn. R. Evid. 403.

At the beginning of the trial, the Defendant made a motion in limine arguing that a portion of a recording received in his discovery materials was irrelevant. Counsel for the Defendant conceded that the first forty-three seconds of the recording of a conversation between the Defendant and Ms. Peeples were relevant. However, he argued that "playing the additional three minutes in front of the jury would be a waste of time[.]" The State responded that the entire four-minute recording was "relevant because there [were] some veiled and not-so-veiled threats made to this witness who was the mother of [the Defendant's] child; that if she turned him in or if she snitched on him what would happen to her." After listening to the entire audio recording, the trial court ruled that it was admissible because it was relevant and not unfairly prejudicial. The Defendant confessed to participating in the robbery and murder of the victim, and he appeared to threaten Ms. Peeples regarding her knowledge of the incident. Specifically, the trial court reasoned as follows:

> The whole tone of the converation is threatening; so, to say that it's not relevant, I disagree as well. She had the wherewithal to record it. She can try to describe, of course, how the conversation went, but the best evidence of the conversation is the actual conversation. So, I think it's admissible, and I'm going to allow it.

We conclude that the trial court did not abuse its discretion by admitting the four minute long audio recording, considering the Defedant's admission and threatening remarks therein. See State v. Doris Ann Whaley, No. E2010-00389-CCA-R3-CD, 2011 WL 2519762, at *15 (Tenn. Crim. App. June 23, 2011) (holding the probative value of a tape recording which included profanity and threats was not substantially outweighed by the danger of unfair prejudice). The Defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions of first degree murder in the attempt to perpetrate a robbery and attempted especially aggravated robbery. Specifically, he argues that his intention in visiting the victim's home was solely for the purpose of purchasing marijuana and that there was no evidence that the Defendant planned to commit a robbery. He contends that the State's evidence only corroborated his version of events. He further aruges that he was not criminally responsible for the actions of Mr. Nesbitt. The State relied heavily on the

recorded conversation between the Defendant and Ms. Peeples in proving that the Defendant assisted Mr. Nesbitt in robbing and murdering the victim. Despite conceding its relevancy, the Defendant argues that the supposed admission regarding his assistance was unclear on the recording and that the quality of the recording was poor. Thus, there was insufficient evidence at trial to support his convictions. The State responds that there was sufficient evidence to sustain the Defendant's convictions either as a principal actor or under a theory of criminal responsibility.

An appellate court's standard of review when the Defendant questions the sufficieny of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "'a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more.'" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, first degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . [a] robbery . . . ." See Tenn. Code Ann. § 39-13-202(a)(2). Additionally, "[n]o culpable mental state is requried for conviction under subdivision (a)(2) . . . , except the intent to commit the enumerated

-9-

offenses or acts in those subdivisions." "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "Especially aggravated robbery is robbery . . . accomplished with a deadly weapon" and "where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403.

A conviction for criminal attempt, as relevant here, requires proof that the defendant acted "with the intent to complete a course of action or cause a result that would constitute the offense [of especially aggravated robbery], under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). As relevant here, a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

Criminal responibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). To prove guilt through a theory of criminal responsibility the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Here, the evidence was sufficient to support the Defendant's convictions. There was proof that the Defendant was present during the crime and assisted Mr. Nesbitt in committing the crime. The Defendant drove to the victim's home with Mr. Nesbitt and at least one other person. He entered the victim's apartment three times, and on the third trip, Mr. Nesbitt also came inside the apartment, shot the victim, and searched the victim's pockets. Ms. Jones testified that both the Defendant and Mr. Nesbitt were armed. The Defendant left the apartment complex with Mr. Nesbitt.

Additionally, the Defendant admitted to Ms. Peeples that he assisted Mr. Nesbitt in the murder of the victim. He threatened to "lay hands on her" if she informed the police what he had told her. Ms. Douglas identified the Defendant as being present in the

apartment at the time of the shooting, and his fingerprint was found on the candle holder from the victim's living room that he used to light a cigarette. The Defendant argued that he was unaware of Mr. Nesbitt's plan to rob or kill the victim; however, the jury chose to accredit the State's proof despite the Defendant's testimony to the contrary. We conclude that there was sufficient evidence for a reasonable juror to find the Defendant guilty either as a principal actor or under a theory of criminal responsibility.

<u>CONCLUSION</u>

Based upon the foregoing, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE